the premises after the August 2, 2000 fire.[7]

Moreover, while plaintiffs deny in their pleadings defendant's conclusion that the August 2, 2000 fire rendered the 90-92 Miles Street property a "constructive total loss," they have not set forth any specific facts or pointed to any evidence that creates a genuine dispute about this conclusion. Defendant's property adjuster, after reviewing the Fire Marshall's report and examining the premises, concluded that "[t]he building had no value after the August 2, 2000 fire;" and that "[t]he building was unsafe and not habitable due to extensive structural damage rendering the home a constructive total loss due to the August 2, 2000 fire." See Guzik Aff. [[Doc. # 69, Ex. C] at ¶¶ 7-9. In response, plaintiffs point to zoning permit issued by the City of Bridgeport on January 29, 2001, after both fires, which plaintiffs claim demonstrates that even after the second fire the building was not a total constructive loss requiring demolition, and instead needed only "repairs." The permit application belies plaintiffs' assertion.

---

[7] While the parties dispute whether plaintiffs resided on the premises prior to the first fire, as plaintiffs testified during their Examinations under Oath that they lived there, and presented utility bills for the premises, and defendant's experts submitted affidavits stating that the building lacked plumbing, heat, and hot water, this issue is not material in light of the August 3, 2000 policy inception date. See, e.g. Affidavit of Robert Nattrass [Doc. # 69, Ex. B] at ¶ 17; Gore Examination [Doc. # 79, Ex. B] at 105-07.

23

The application signed by Earl Craig describes the work to be done as "repair fire damage — walls, ceilings, floors, stairs, etc." See Application For Certificate of Zoning, Jan. 29, 2001 [Doc. # 79, Ex. C]. The permit further provides that the work intended is to "replace walls, ceilings, stairs, floors, etc." See id. at 2. As the application acknowledges the need to "replace" the walls, ceilings, stairs, and floors of the building, it supports rather than contradicts defendant's expert opinion that the building was a constructive loss. Plaintiffs have presented no evidence demonstrating that the building did not become a constructive loss until the August 4, 2000 fire. Plaintiffs' adjuster, Wesley Robinson, stated during his deposition testimony that at the time he examined the property, his "understanding was that I was under the premise that there was just one fire." See Deposition of Wesley Robinson, June 19, 2003 [Doc. # 79, Ex. V] at 17. As a result, he stated that was not able to make any effort to distinguish what was lost in one fire versus the other fire. See id. The deposition testimony in the record before the Court expresses no opinion about the nature of the damage to the property after either fire. Defendant's evidence thus remains uncontroverted.

Based on the above facts, the Court concludes that Colonial Penn acted in accordance with its policy terms in denying plaintiffs coverage based on their material misrepresentation in

not informing Colonial Penn of the August 2, 2000 fire, and based on a loss amount of zero for the August 4, 2000 fire. See Colonial Penn Homeowners Insurance Policy, [Doc. # 69, Ex. D] at 39 ¶ 2 (Section I and II Conditions).[8] Plaintiffs' bad faith claim is therefore unavailing.

### C.  CUIPA and CUPTA

Counts Four and Five of plaintiffs' complaint allege violations of the Connecticut Unfair Insurance Practices Act ("CUIPA") and the Connecticut Unfair Trade Practices Act ("CUPTA"). Plaintiffs' CUIPA claim alleges that Colonial Penn engaged in unfair claim settlement practices by "misrepresenting pertinent facts and insurance policy provisions;" "[f]ailing to acknowlege and act with reasonable promptness;" "[f]ailing to adopt and implement reasonable standards for the prompt investigation and resolution of claims;" "[f]ailing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;" "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims; and "[r]efusing to pay the Plaintiffs insured." See

---

[8]The third ground relied on Colonial Penn in its summary judgment motion is that the property was not a "residence premise" from the date of policy inception to the date of loss. See Colonial Penn Homeowners Insurance Policy, [Doc. # 69, Ex. D] at 4 (Section I Property Coverages). Because the Court finds the first two bases independently sufficient to support Colonial Penn's denial of coverage, it need not reach the issue of whether property could be deemed a "residence premise."

Complaint [Doc. # 1] at ¶ 18.

While there is some conflict among Connecticut courts as to whether there is a private right of action under CUIPA, it is generally accepted, at minimum, that a plaintiff may use CUPTA as a vehicle to bring a claim for unfair settlement practices under CUIPA. See Macomber v. Travelers Property & Casualty Corp., 261 Conn. 620, 645 & n. 14 (2002) (permitting plaintiffs to assert a CUPTA violation based on CUIPA, even where CUIPA count was pleaded as a stand alone claim, and therefore not addressing argument that there is no private right of action under CUIPA); Mead v. Burns, 199 Conn. 651, 663 (determining that it is possible to state a cause of action under CUPTA for a violation of CUIPA). Moreover, although insurance practices are regulated under both CUPTA and CUIPA, a "CUPTA claim must be consistent with the regulatory principles established in the underlying [insurance] statutes." Mead, 199 Conn. at 665. Accordingly, this Court will consider both the CUPTA and CUIPA counts together.

Under CUPTA as under CUIPA, "isolated instances of unfair insurance settlement practices" are not cognizable. Id. at 666. CUIPA prohibits insurers from "[c]ommitting or performing with such frequency as to indicate a general business practice" a variety of unfair or deceptive claims settlement practices. See Conn. Gen. St. § 38a-816(6). Thus, as the Connecticut Supreme

26

Court has construed this provision, "claims of unfair settlement practices . . . require a showing of more than a single act of insurance misconduct." Id. at 659.

Colonial Penn argues that plaintiffs have failed to set forth any evidence from which a reasonable jury could find a "general business practice" of unfair claims settlements. In opposition, Colonial Penn identifies two facts. First, Colonial Penn references two published cases showing that Colonial Penn has been sued for unfair claim settlement practices. See McGeouch v. Colonial Penn Ins., No. C-92-343-L, 1994 WL 260684 (D.N.H. Apr. 7, 1994); Eveleno v. Colonial Penn Ins., 188 Misc. 2d 454 (N.Y. Civ. Ct. 2001). The two cases cited are not evidence of a general business practice of unfair claims settlement, as McGeouch finds no wrongdoing and merely denies the insurer's motion for summary judgment given the factual disputes in the case, see McGeouch, 1994 WL 260684, at * 2, and Eveleno finds a violation of a New York statute requiring a response by the insurer within 15 days after receipt of proof of loss — a statutory violation that is not at issue here, see Eveleno, 188 Misc. 2d at 456.

Plaintiffs also points to a newspaper article ranking Colonial Penn as the second worst homeowners insurance company in California in 1993, as measured by a survey of complaints made to

27

the California Department of Insurance.[9] See <u>Garamendi's 'Good, Bad and Ugly' Annual Report Highlight State's Best and Worst Auto, Homeowners and Life Insurers; Study Based on 1992 Consumer Complaints</u>, Business Wire, Oct. 21, 1993 [Doc. # 79, Ex. X]. This news article, aside from being inadmissible evidence itself, is not shown to have relevance to the case at hand, as the article does not describe the nature of the complaints against the insurers. While plaintiffs state in their memorandum in opposition that they have requested copies of all similar complaints against Colonial Penn filed with the Connecticut Department of Insurance over the past three years, the Court notes that discovery closed before summary judgment was sought, and plaintiffs never brought to the Court's attention any difficulty in timely obtaining such documents within the discovery period. Moreover, in the several extensions of time for filing their opposition, plaintiffs never raised their need for such documents to respond to defendant's motion. In the absence of any evidence in the record of a pattern of unfair claims settlement practices by Colonial Penn, plaintiffs' CUIPA and CUPTA claims fail.

### D. Intentional and Negligent Misrepresentation

---

[9] The Business Wire article, datelined Los Angeles, references a state Department of Insurance Report issued by Insurance Commissioner John Garamendi. The Court takes judicial notice that John Garamendi is Commissioner of the California Department of Insurance.

28

Counts Six and Seven of plaintiffs' complaint allege that Colonial Penn intentionally and/or negligently made misrepresentations to plaintiffs. Plaintiffs complaint fails to identify with particularity any of the circumstances alleged to constitute fraud. Colonial Penn thus argues that plaintiffs fail to satisfy the pleading standard under Fed. R. Civ. P. 9(b). In this Circuit, "when a complaint charges fraud, it must (1) detail the statements . . . that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements . . . were made, and (4) explain why the statements . . . are fraudulent." Olsen v. Pratt & Whitney Aircraft, 136 F.3d 273, 275 (2d Cir. 1998) (citation and internal quotation marks omitted). Plaintiffs' complaint is clearly deficient under this standard, as Counts Six and Seven merely incorporate the first 16 paragraphs of plaintiffs' complaint, which do not identify any claimed fraudulent statements, and concludes, without any specificity as to the time, place, speaker, or content of the alleged misrepresentations that Colonial Penn knew or should have known that its representations were false, and that Plaintiffs would reasonably rely upon its representations. See Complaint [Doc. # 1] at Counts Six, Seven ¶ 17.

Even if plaintiffs could survive the stringent pleading standard of Fed. R. Civ. P. 9(b), the evidence plaintiffs identify is insufficient to survive summary judgment on the

29

substantive intentional and negligent misrepresentation claims. To prove a claim for intentional misrepresentation, plaintiffs must show: "(1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." Miller v. Appleby, 183 Conn. 51, 54-55 (1981)(citations omitted). A negligent misrepresentation is actionable even if the declarant did not know it to be untrue "if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth." Updike, Kelly and Spellacy, P.C. v. Beckett, 269 Conn. 613, 643 (2004) (citations and internal quotation marks omitted). In their opposition to summary judgment plaintiffs cite generally to their testimony during the Examinations Under Oath, which they summarize in their memorandum of law as stating that Colonial Penn's agents represented that "there was coverage, and that they would honor their obligations under the policy, and pay the plaintiffs in the event of losses such as the Plaintiffs suffered on August 2, 2000 and August 4, 2000." See Plaintiffs' Memorandum of Law in Support of Plaintiffs' Opposition to Summary Judgment [Doc. # 79] at 26-27. The Court's review of plaintiffs' testimony does not reveal any claimed misrepresentation by defendant about the date of policy inception or the existence of coverage for the August 2, 2000

30

fire. In fact, Gore testified that she did not know when the insurance policy would be issued. See Gore Examination [Doc. # 79, Ex. B] at 130-133. The evidence in the record demonstrates no more than that Colonial Penn agreed to provide coverage in accordance with the policy terms, and that Colonial Penn determined that plaintiffs were excluded from coverage under the terms of the policy. On the facts in the record, there is no basis for plaintiffs' claims of negligent and intentional misrepresentation in Counts Six and Seven.

### E. Intentional and Negligent Infliction of Emotional Distress

Count Nine of Plaintiffs' complaint alleges intentional and negligent infliction of emotional distress. To prevail on a claim of intentional infliction of emotional distress, plaintiffs must establish the following four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Carrol v. Allstate Ins. Co., 262 Conn. 433, 443 (2003) (citations and internal quotation marks omitted). "Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society. . . . Liability has been found only where the

31

conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!" Id.

A claim of negligent infliction of emotional distress, in turn, must satisfy the following elements: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of plaintiff's distress." Id. at 444.

In resolving this claim, this Court is guided by the Connecticut Supreme Court's decision in Carrol, 262 Conn. at 444. In Carrol, the Connecticut Supreme Court, reviewing a judgment for the plaintiff after a jury trial, concluded that an insurance investigation, even where it is hasty, incomplete, and ill-reasoned, or where it improperly concluded that a fire had been deliberately set, is simply "not so atrocious as to trigger liability for intentional infliction of emotional distress." Id. at 444. Nonetheless, the Court concluded that the jury reasonably could have found that "the defendant's conduct created

32

an unreasonable risk of causing the plaintiff's emotional distress and that the plaintiff's distress was foreseeable," sufficient for a claim of negligent infliction of emotional distress, where "the defendant's arson investigation had been hasty, incomplete and ill-reasoned;" and "the plaintiff's race might have played a role in the defendant's conclusion of arson." Id. at 445, 448.

Here, as in Carrol, plaintiffs have not set forth evidence from which a jury could reasonably conclude that Colonial Penn's conduct in investigating and denying their claim was extreme and outrageous. While plaintiffs have characterized Anthony DiBiase's deposition testimony as stating that defendant's investigator referred to plaintiffs using a racial slur, as discussed above, the Court's review of the transcript reveals at best that Mr. DeBiase testified that he did not recall speaking to Colonial Penn's investigator or informing Mr. Craig that the investigator used a racial slur, but that "anything is possible" and he would not deny it was said. See Deposition Transcript of Anthony DeBiase, Sept. 25, 2003 [Doc. # 98] at 19, 52. Mr. DeBiase's testimony is not evidence that a racial slur was used in plaintiffs' presence, and plaintiffs have presented no affirmative evidence to support this claim.[10] In the absence of such evidence, plaintiffs' emotional distress claim is wholly

---

[10]See supra note 3.

unsupported.

Moreover, as to plaintiffs' claim of negligent infliction of emotional distress, the facts here are distinguishable from Carrol, in that Colonial Penn, as discussed in Part III.B, had reasonable grounds to deny plaintiff's claim, and in that plaintiffs have failed to identify with any specificity why they claim Colonial Penn's investigation was procedurally unfair. Where, as here, there are undisputed grounds permitting Colonial Penn to deny plaintiffs' insurance claim, plaintiffs cannot establish a claim for negligent infliction of emotional distress.

**E. Defamation**

Count Eight of plaintiffs' complaint alleges defamation on grounds that Colonial Penn falsely accused plaintiffs of committing arson. A defamation statement is defined as "that which tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory, or unpleasant feelings or opinions against him." Lowe v. City of Shelton, 83 Conn. App. 750, 765-66 (Conn. App. 2004). A claim of defamation requires "that the defendant[] published false statements that harmed the [plaintiffs], and that the defendant[] [was] not privileged to do so." Torosyan v. Boehringer Ingelheim Pharm., Inc., 234 Conn. 1, 27 (1995). Thus, "to establish a prima facie case of defamation, the plaintiff must demonstrate

34

that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." Cweklinsky v. Mobil Chemical Co., 267 Conn. 210, 217 (2004).

Some categories of defamatory speech are deemed actionable "per se" because "the defamatory meaning of [the speech] is apparent on the face of the statement...." Battista v. United Illuminating Co., 10 Conn. App. 486, 491-92, cert. denied, 204 Conn. 802, 803 (1987). Accusations of a committing a crime of moral turpitude, a category in which arson would qualify, are deemed actionable per se, and injury is assumed. See Miles v. Perry, 11 Conn. App. 584, 601-602 (1987); DeVito v. Schwartz, 66 Conn. App. 228, 234 (2001).

Here, defendants argue and the Court agrees that the May 9, 2001 letter sent by Colonial Penn's Regional Claim Director, Thomas P. Kelly, to plaintiffs' counsel, which in the process of informing plaintiffs of the reasons for denial of the claim accused plaintiffs of intentionally setting fire to their house, does not constitute "publication" of a defamatory statement. See Cweklinsky, 267 Conn. at 218 (concluding that "[a]s a general rule, . . . no action for defamation exists if the defendant publishes the defamatory statements to only the plaintiff, and

35

the plaintiff subsequently disseminates the statements to a third person" and rejecting doctrine of "compelled self-publication defamation").

Plaintiffs' only claim of publication is the statement purportedly made by defendant's investigator, Tim Lawson, to Anthony DeBiase, referring to plaintiffs using a racial slur and accusing plaintiffs of trying to buy a house for $1.00 and burn it down in order to collect insurance money. As the Court has concluded above, plaintiffs mischaracterize Anthony DeBiase's deposition transcript, and have presented no other evidence that such a statement was ever made to Mr. DeBiase or anyone else. Mr. DeBiase testified that he did not remember meeting Colonial Penn's investigator and did not remember the investigator making such comments. See Deposition Transcript of Anthony DeBiase, Sept. 25, 2003 [Doc. # 98] at 19, 52. Because there is no evidence in the record that defendants published their accusations of arson against defendants to a third party, plaintiffs cannot support an essential element of their defamation claim.

**IV. Conclusion**

For the foregoing reasons, defendant's motion for summary judgment [Doc. # 68] is hereby GRANTED on all counts of plaintiffs' complaint. As plaintiffs have not submitted affidavits in their names, defendant's Motions to Preclude

Plaintiffs from Presenting Affidavits from Plaintiff in Opposition to Motion for Summary Judgment [Docs. ## 72, 74] are denied as moot. In light of this Court's summary judgment ruling, defendant's Motion to Strike Unsupported Factual Allegations in Plaintiffs' Opposition to Defendant's Motion for Summary Judgment [Doc. # 91] is also denied as moot. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this** 15th **day of September, 2004.**