UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

Sep 15   1 : PM '04

Earl Craig and        :
Mary Gore           :
                   :
v.                  :     No. 3:02cv1630(JBA)
                   :
Colonial Penn Insurance Co.   :

**Ruling on Defendant's Motion for Summary Judgment [Doc. # 68];
Motions to Preclude Plaintiffs from Presenting Affidavits from
Plaintiff in Opposition to Motion for Summary Judgment [Docs. ##
72, 74]; Motion to Strike Unsupported Factual Allegations in
Plaintiffs' Opposition to Defendant's Motion for Summary Judgment
[Doc. # 91]**

Defendant Colonial Penn Insurance Company ("Colonial Penn")
has moved for summary judgment in its favor on all counts in
plaintiffs' complaint.  For the reasons discussed below,
defendant's summary judgment motion [Doc. # 68] is granted.
Defendant's motions to preclude [Docs. # 72, 74] and motion to
strike [Doc. # 91] are denied as moot.

## I.  Background

This case arises out of defendant Colonial Penn's denial of
plaintiffs' claim for coverage under their homeowner's insurance
policy after a fire destroyed their premises.  Colonial Penn
issued a homeowner's insurance policy to plaintiffs Earl Craig
and Mary Gore for a residence located at 90-92 Miles Street in
Bridgeport, Connecticut, which by its terms incepted on August 3,
2000 at 12:01 A.M.  See Colonial Penn Insurance Company Policy
No. 614042180 [Doc. # 69, Ex. I].  A fire occurred at this

1

property on or about August 2, 2000 at 1:15 AM, prior to the inception date of the policy.  See Bridgeport Fire Department Incident Report, Aug. 2, 2000 [Doc. # 69, Ex. A].  A second fire on the same premises occurred on August 4, 2000.  See Bridgeport Fire Department Incident Report, Aug. 4, 2000 [Doc. # 69, Ex. E].  Plaintiffs filed a claim with Colonial Penn on August 28, 2000 as a result of the August 4, 2000 fire.  After an investigation, Colonial Penn denied plaintiffs claim on May 9, 2001, offering in its letter to plaintiffs' counsel ten grounds for its denial.  See Letter of Thomas P. Kelly, Regional Claims Director, Colonial Penn [Doc. # 69, Ex. J].

The parties dispute some of the bases for the claim determination, including whether the plaintiffs owned the house they had insured on the dates at issue, and whether plaintiffs intentionally set the fires on the insured property.  For the purposes of this summary judgment motion, however, Colonial Penn focuses on three of the bases for its denial of coverage: (1) that plaintiffs did not disclose to them the fire that occurred on August 2, 2000, prior to the inception date of the policy, in violation of the Homeowners Insurance Policy, which provides "[w]e do not provide coverage for any loss, if before or after the loss an insured has . . . intentionally concealed or misrepresented any material fact or circumstance;" Colonial Penn Homeowners Insurance Policy, Section I and II Conditions [Doc. #

2

69, Ex. D] at 39 ¶ 2; (2) that plaintiffs did not suffer a loss from the August 4, 2000 fire, because the fire that occurred two days earlier resulted in the total destruction of the premises, so that the "actual cash value of the building and contents subsequent to that loss is zero;" See Letter of Thomas P. Kelly, Regional Claims Director, Colonial Penn [Doc. # 69, Ex. J] at ¶ V; and (3) that plaintiffs did not reside at the insured premises on the inception date of the policy or on the date of loss, excepting them from coverage under their homeowners insurance policy, which provides for coverage of "[t]he dwelling on the residence premises" which is defined as "the one or two family dwelling, the other structures, and grounds or that part of any other building where you reside and which is shown as the 'residence premises' in the Declarations." See Colonial Penn Homeowners Insurance Policy, Section I Property Coverages [Doc. # 69, Ex. D] at 4. As to these asserted bases for denial, the following facts are relevant.

Plaintiffs' homeowners insurance policy with Colonial Penn provides that its effective date was August 3, 2000, and had a policy period covering August 3, 2000 to August 3, 2001. See Colonial Penn Insurance Company Policy No. 614042180 [Doc. # 69, Ex. I]. According to Colonial Penn's underwriting file, the policy incepted on August 3, 2000 upon Colonial Penn's receipt of plaintiffs' payment of premium. See Affidavit of Patti Tystad,

3

Homeowner's Product Manager, Colonial Penn Insurance Company
[Doc. # 69, Ex. D] at ¶7.  Defendant's records show that
plaintiffs authorized an electronic transfer of funds in a
telephone conversation on August 2, 2000 with a Ms. Tony Crosby,
a former Sales Representative employed by Colonial Penn.  See
id.; see also Letter of Thomas P. Kelly, Regional Claims
Director, Colonial Penn [Doc. # 69, Ex. J] at ¶ II (B) (stating
that Colonial Penn's 800 number phone records revealed "two phone
calls on August 2, 2000 made from a telephone booth on
Connecticut Avenue in Bridgeport very near to the insured
premises," and concluding that "these telephone calls were made
by the insureds.").

Plaintiff Mary Gore testified at her Examination Under Oath
with Colonial Penn investigators that she first contacted
Colonial Penn about purchasing homeowners insurance on July 17,
2000.  See id. at 117.  Gore testified that after talking with a
Colonial Penn agent again on July 19, who informed her of the
premium amount, she mailed a check to Colonial Penn on July 21,
2000 for $131.65.  See id. at 117.  According to Gore, before the
first fire, she called the insurance company again by pay phone,
and was informed that they had not yet received her check.  See
id. at 118, 120.  Gore testified that Colonial Penn executed a
withdrawal from Craig's checking account over the phone on that
day.  See id. at 118.  While Gore could not recall on which day

4

she called Colonial Penn and debited the checking account, she testified that it was "way before" the first fire. Id. at 118. According to Gore, she "didn't know when [Colonial Penn] was going to issue the policy." Id. at 132.

Colonial Penn received plaintiffs' signed application for insurance, along with a photograph of the house, on August 14, 2000, in an envelope postmarked August 7, 2000. See Affidavit of Patti Tystad, Homeowner's Product Manager, Colonial Penn Insurance Company [Doc. # 69, Ex. D] at ¶¶ 8-11. The application is dated July 31, 2000. See Examination Under Oath of Mary Gore ("Gore Examination") [Doc. # 79, Ex. B] at 124. Above the signature line, the application provides, "I understand that this policy will not be issued or continued unless I have, one, answered all the questions, two signed and dated this application." Id. at 132. In addition, above Gore's signature on the application, it states "I understand that my application is subject to acceptance by Colonial Penn . . . . If I qualify I request the policy become effective at 12:01 a.m. __/__/__ but in no event prior to seven days following the post mark on the envelope containing my premium." Id. at 126. To this statement Gore added "A/S/P/," which she explained at her Examination Under Oath meant "as soon as possible," and which she wrote at the recommendation of the insurance agent. Id. at 125, 126.

The parties do not dispute that two fires broke out at 90-92

5

Miles Street in Bridgeport on August 2 and August 4, 2000.  Gore testified that she did not know whether she had insurance prior to the first fire.  See id. at 126.  Plaintiffs state that at the time of the first fire, they were living in the first floor apartment at 90 Miles Street, and that their apartment was equipped with gas heat, a working furnace, and functioning plumbing facilities.  See id. at 107.  Plaintiffs intended to rent out the third floor apartment, which Gore stated was similarly equipped.  See id. at 105-06.  On the night of the August 2, 2000 fire, plaintiffs were not present at the Miles Street residence.  Gore testified that she first learned that a fire had occurred at her Miles Street address on the morning of August 2, when she arrived at approximately 10:30 AM with a prospective tenant to find "a burnt house."  See id. at 108, 120. The Bridgeport Fire Department's Incident report from August 2, 2000 indicates that the fire occurred at approximately 1:15 AM, and involved "Heavy Fire on arrival in rear interior stairwell on all 3 floors.  Fire entending throughout interior of structure on all floors . . . .  Vacant structure. . . .  Very heavy damage in rear on all floor & cockloft area.  Rear interior stairs totally burned out."  Bridgeport Fire Department Incident Report, Aug. 2, 2000 [Doc. # 69, Ex. A].

According to Gore, when she discovered the fire on the morning of August 2, she went to the fire department, where they

6

took her insurance information.  Although she initially believed that the fire department would file an insurance claim on her behalf, she later learned that she would need to do so on her own, whereupon she contacted an attorney to assist her.  See Gore Examination [Doc. # 79, Ex. B] at 109, 113.

The second fire broke out on August 4, 2000.  The Bridgeport Fire Department characterized this fire as a "3 story vacant house fire with heavy fire on 1st Fl. extending to 2nd Fl."  Bridgeport Fire Department Incident Report, Aug. 4, 2000 [Doc. # 69, Ex. E].  Colonial Penn's records reveal that Gore reported a claim for the August 4 fire on August 28, 2000.  See Affidavit of Michael White, Jan. 28, 2004 [Doc. # 69, Ex. I] at ¶ 6; Colonial Penn Claim Inquiry General Information [Doc. # 69, Ex. I] at 3 (giving claim inquiry date as 8/28/00 and loss date as 8/4/00).  Colonial Penn asserts that no claim was made for the August 2, 2000 fire.  See id.

Upon receipt of plaintiffs' claim, Colonial Penn began its investigation.  Defendant hired Robert Nattrass, a Certified Connecticut Fire Marshall employed by Acacia Investigations, to examine the 90-92 Miles Street property.  His examination found that prior to the fire, the building was not habitable because "[p]iping had been disconnected in the bathroom and the sink was completely missing.  The copper water piping was missing and the plastic and iron waste piping was disconnected in the bathroom

7

prior to the fire.  The baseboard heating pipes had been removed in at least two rooms."  See Affidavit of Robert Nattrass [Doc. # 69, Ex. B] at ¶ 17.  Nattras also found that the 90-92 Miles Street building was structurally unsound after the August 2, 2000 fire, and required demolition.  See Affidavit of Robert Nattrass, Jan. 26, 2004 [Doc. # 69, Ex. B] at ¶ 10.  Marion Guzik, a property adjuster hired by Colonial Penn to examine the premises and review the Fire Marshall's report, similarly concluded that "as a result of the fire on August 2, 2000, the building was a total constructive loss and required demolition;" that "[t]he building had no value after the August 2, 2000 fire;" and that "[t]he building was unsafe and not habitable due to extensive structural damage rendering the home a constructive total loss due to the August 2, 2000 fire."  See Affidavit of Marion Guzik, Jan. 26, 2004 [Doc. # 69, Ex. C] at ¶¶ 7-9.  Based on these findings, among others, Colonial Penn denied plaintiffs' claim for coverage on May 9, 2001.  See Letter of Thomas P. Kelly, Regional Claims Director, Colonial Penn [Doc. # 69, Ex. J].

In the aftermath of the early August 2000 fires, plaintiffs lived for a period of time in a mobile home on the property of 90-92 Miles Street, see Gore Examination [Doc. # 79, Ex. B] at 141, and subsequently were homeless.  Plaintiffs brought suit against Colonial Penn in Connecticut Superior Court for the Judicial District of Fairfield on August 21, 2002, alleging

8

breach of contract, breach of covenant of good faith and fair dealing, a violation of the Connecticut Unfair Insurance Practices Act ("CUIPA"), a violation of Connecticut's Unfair Trade Practices Act ("CUPTA"), false representations, defamation, and intentional and negligent infliction of emotional distress. On September 13, 2002 defendant removed the suit to this Court as a diversity case, and now seeks summary judgment in its favor on all counts of plaintiffs' complaint.

## II.  Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In moving for summary judgment against a party who will bear the burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.").  In order to defeat summary judgment, the

9

non-moving party must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) ("There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

When deciding a motion for summary judgment, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-588 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). However, "[w]hen a motion for summary judgment is made and supported as provided in [the Federal Rules], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R. Civ. P. 56(e). Instead, the party opposing summary judgment must set forth the specific facts in affidavit or other permissible evidentiary form that demonstrate a genuine issue for trial. See id.

### III.  Discussion

#### A.  Breach of Contract

The Colonial Penn Homeowners Insurance Policy provides, as a condition to bringing a suit against them, that "[n]o action can be brought unless the policy provisions have been complied with

10

and the action is started within one year after the date of
loss." See Colonial Penn Homeowners Insurance Policy, Section I,
Conditions [Doc. # 69, Ex. D] at 25, ¶ 8. Based on this
provision, Colonial Penn argues that plaintiffs' breach of
contract claims in Counts One and Two of the complaint are time
barred, as plaintiffs brought suit on August 21, 2002, over two
years after the date of loss, and over one year after Colonial
Penn denied their claim. The Connecticut Supreme Court has long
held that a contractual condition in an insurance policy
requiring an action to be brought with a particular time period
"is a part of the contract . . . [and] is valid and binding upon
the parties." Chichester v. New Hampshire Fire Ins. Co., 51 A.
545 (Conn. 1902). Thus, plaintiffs' non-compliance with such a
provision "is a complete defense, unless the plaintiff in his
reply alleges facts sufficient in law to excuse his
nonperformance of the condition." See id. at 546; see also
Bocchino v. Nationwide Mutual Fire Ins. Co., 246 Conn. 378, 383-
84 (1998); Monteiro v. American Home Assurance Co., 177 Conn.
281, 283 (1979) (reaffirming Chichester).

Plaintiffs acknowledge that they failed to comply with the
policy's one-year limitations period, but argue that they should
be excused from compliance under the doctrines of promissory and
equitable estoppel, because Colonial Penn's denial of coverage
came ten months after plaintiffs' claim was made, and defendant

11

thereby "violated its duty to settle the Plaintiffs' claim promptly, fairly, and equitably." Plaintiffs' Memorandum of Law in Support of Plaintiffs' Opposition to Summary Judgment [Doc. # 79] at 16.

Under Connecticut law, any claim of estoppel, whether promissory or equitable, "is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury.... It is fundamental that a person who claims an estoppel must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge." Chotkowski v. State, 240 Conn. 246, 268 (1997) (citations and internal quotation marks omitted); see also Union Carbide Corp. v. City of Danbury, 257 Conn. 865, 873 (2001). The doctrine of promissory estoppel requires proof of "a clear and definite promise" by a party that reasonably could have been expected to induce reliance, while the doctrine of equitable estoppel "involves only representations and inducements." See Union Carbide Corp., 257 Conn. at 874 n.2 (citations and internal quotation marks omitted).

Here, plaintiffs have not identified any evidence that would

12

support invocation of either doctrine.  While plaintiffs note

that Colonial Penn took ten months to decide their claim,

plaintiffs have not argued that Colonial Penn misled them by this

delay into believing that the one year deadline clearly set forth

in the homeowners policy did not apply.  Plaintiffs' memorandum

in opposition to summary judgment refers to Gore's deposition

testimony "that at all times she did whatever the Defendant's

agents/representatives told her to do."  See Plaintiffs'

Memorandum of Law in Support of Plaintiffs' Opposition to Summary

Judgment [Doc. # 79] at 16.  Plaintiffs have not identified with

particularity what part of Gore's Examination Under Oath is

referenced.[1]  The Court's review of the record has found no

testimony by Gore of any representations made by Colonial Penn

about how or when plaintiffs could challenge a claims

determination, only that Gore completed the insurance application

as Colonial Penn's agent instructed her over the phone.  See Gore

Examination [Doc. # 79, Ex. B] at 124, 134.  The record before

the Court, in fact, indicates that Colonial Penn informed

plaintiffs that it continued to require compliance with the

policy's terms.  See Letter of Joel Rottner to Earl Craig, Oct.

4, 2000 [Doc. # 95, Ex. A] at 4 (informing Craig that an

Examination Under Oath would be necessary before Colonial Penn

---

[1]Plaintiffs have referenced an Exhibit R, which does not
exist in the record.  The Court has reviewed the portions of Mary
Gore's Examination Under Oath that are included at Exhibit B.

13

could give further consideration to his request for payment, and stating: "In the meantime, the Colonial Penn Insurance Company respectfully continues to require full and complete compliance with all of the terms and conditions of the insurance contract and continues to reserve any and all rights and defenses which may now exist or which may arise in the future. No waiver or estoppel of any kind is intended nor should any be inferred."). Moreover, even if Colonial Penn's delay could be said to induce plaintiffs to wait to until they received Colonial Penn's determination before filing suit, the May 9, 2001 denial still left plaintiffs with approximately three months in which to file this suit before the expiration of the one-year deadline. As plaintiffs have not pointed to any evidence that would indicate that Colonial Penn induced plaintiffs into refraining from filing suit until the 12 month filing deadline had passed, the doctrine of estoppel is inapposite. Plaintiffs' breach of contract claim thus is time-barred.

### B.  Bad Faith

Count Three of plaintiffs' complaint alleges that Colonial Penn breached the contract's implied covenant of good faith and fair dealing. The landmark case of <u>Gruenberg v. Aetna Insurance Co.</u>, 9 Cal.3d 566 (1973), first recognized a cause of action for an implied covenant of good faith and fair dealing in an insurance contract, which the court described as:

14

the obligation, deemed to be imposed by the law, under which
the insurer must act fairly and in good faith in discharging
its contractual responsibilities. Where in so doing, it
fails to deal fairly and in good faith with its insured by
refusing, without proper cause, to compensate its insured
for a loss covered by the policy, such conduct may give rise
to a cause of action in tort for breach of an implied
covenant of good faith and fair dealing.

Id. at 573-74.

As Connecticut law similarly provides, this cause of action

sounds in tort. See Buckman v. People Express, Inc., 205 Conn.

166, 170 (1987). "To constitute a breach of that covenant, the

acts by which a defendant allegedly impedes the plaintiff's right

to receive benefits that he or she reasonably expected to receive

under the contract must have been taken in bad faith." Alexandru

v. Strong, 81 Conn. App. 68, 80-81 (Conn. App. 2004). "Bad faith

in general implies both actual or constructive fraud, or a design

to mislead or deceive another, or a neglect or refusal to fulfill

some duty or some contractual obligation, not prompted by an

honest mistake as to one's rights or duties, but by some

interested or sinister motive.  Bad faith means more than mere

negligence; it involves a dishonest purpose." Habetz v. Condon,

224 Conn. 231, 237-38 (1992) (citations and internal quotation

marks omitted).

In support of their claim of bad faith, plaintiffs contend

that Colonial Penn failed to pursue leads provided by plaintiffs,

including that the Bridgeport Fire Department and Police

Department believed others may have been involved in the arson at

15

90-92 Miles Street, not plaintiffs.   Plaintiffs fiercely dispute
Colonial Penn's accusations that they committed arson in order to
collect the insurance money, and argue that "[t]hese unproven
accusations were ipso facto indicative of the Defendant's bad
faith."  Pls.' Mem. L. [Doc. # 79] at 22.   In addition,
plaintiffs state that Anthony DeBiase, owner of Anthony's
Autobody and a Miles Street neighbor of plaintiffs, testified
during a deposition that one of Colonial Penn's investigators
discussed the fires at 90-92 Miles Street with him and referred
to the Plaintiffs using a racial slur, stating that plaintiffs
were trying to get something for nothing.  See Pl.'s Mem. [Doc. #
79] at 19.  The investigator's racial slur, plaintiffs contend,
is evidence that Colonial Penn jumped to a false conclusion about
plaintiffs' claim because of their race.

Plaintiffs overstate the evidentiary value of Mr. DeBiase's
deposition testimony.[2]   Contrary to plaintiffs' representations,
Mr. DeBiase did not testify that Colonial Penn's investigator
used a racial slur in referring to plaintiffs.   Defendant's
counsel asked Mr. DeBiase if he ever told plaintiffs about such a
comment made by Colonial Penn's investigator, and Mr. DeBiase
responded that he could not recall the investigator speaking to
him, that it was "very possible" that Mr. Lawson made the racist

---

[2]Plaintiffs did not include a copy of the deposition
transcript in the summary judgment record.   In response to this
Court's request, defendant provided a copy of the transcript.

16

comments about plaintiffs to him, but that he did not remember
him making those comments.[3]    Deposition Transcript of Anthony
DeBiase, Sept. 25, 2003 [Doc. # 98] at 19.    Later, plaintiff's
counsel asked Mr. DeBiase the same question, and Mr. DeBiase
responded that he did not remember those comments, that he did

---

[3]The transcript reads:
    Q.  I'm asking you if you specifically remember Mr. Lawson
saying something to you.
    A.  I can't truthfully answer that because I'm still here
trying to recall him.  He said he spoke to me, so —
    Q.  Do you remember him speaking to you?
    A.  Truthfully, no, but he said he did.
    .  .  .
    Q.  Now I'm asking you for a specific memory related to
that.  Do you remember Mr. Lawson saying — this is what the
plaintiffs claim that he said to you, that they were just a
couple of n---rs who had bought the house for a dollar, insured
it, and were trying to get rich overnight.  Do you remember if
Mr. Lawson ever said such a thing to you?
    A.  Very possible.
    Q.  I know it's possible, but do you remember that?
    A.  No, truthfully.
    Q.  Why do you say very possible?
    A.  Because the other guy had, from the neighborhood talk,
had the property, he was stuck with it for taxes and stuff and he
just had to do it, signed it over to these people.

Deposition Transcript of Anthony DeBiase, Sept. 25, 2003 [Doc. #
98] at 18-19.

While counsel's question refers to statements made by plaintiffs
about Mr. Lawson's comments to Mr. DeBiase, the summary judgment
record does not include any such statements made by plaintiffs.
Plaintiffs' direct testimony consists only of their Examinations
Under Oath taken during Colonial Penn's investigation.  No
depositions of plaintiffs were taken as part of this lawsuit, and
no affidavits were submitted.  This Court sanctioned plaintiffs
for failing to appear at depositions Colonial Penn scheduled on
multiple occasions by precluding plaintiffs' further testimony,
unless their depositions were taken.  See Endorsement Order, Dec.
19, 2003 [Doc. # 62].

17

not tell Mr. Craig about the comments, but that "anything is
possible three years ago." <u>Id</u>.  When asked whether he denied
telling Mr. Craig about comments made by Colonial Penn's
investigator, Mr. DeBiase responded, "no."[4] <u>Id</u>.  Even viewed in
the light most favorable to plaintiffs, Mr. DeBiase's testimony
does not establish that defendant's investigator referred to
plaintiffs using a racial slur.  In essence, Mr. DeBiase
testified that while it was possible defendant's investigator
made such a comment, and, when pressed, would not deny that he

---

[4]The deposition transcript reads as follows:

Q.  Attorney Rottner raised with you the question whether or
not a statement by Mr. Craig and Ms. Gore wherein Mr. Lawson said
that Mr. Craig and Ms. Gore were just a couple of n---rs trying
to buy a house for a dollar and burn it down and get the
insurance money, do you remember that?
A.  No I don't, but —
Q.  He raised that question with you.
A.  He asked me about it.  I don't know.
Q.  You said possibly?
A.  If I did, if I remembered it, I would tell you, but I
don't remember that.
Q.  Isn't it true that you told Mr. Craig that Mr. Lawson
made that comment?
.  .  .
A.  No.
.  .  .
Q.  When you said possibly at first —
A.  Possibly what?
Q.  Just in response to Attorney Rottner's question.
A.  Anything is possible three years ago.
Q.  Okay.  So you did not deny the fact that you told that
to Mr. Craig, did you?
A.  No.

Deposition Transcript of Anthony DeBiase, Sept. 25, 2003 [Doc. #
98] at 52.

18

told Mr. Craig about the comment, he did not remember the

investigator making the comment and did not remember telling Mr.

Craig about it.  At best, this testimony amounts to a non-denial

of a fact nowhere in evidence.  Questions by counsel are not

evidence, and a witness's non-denial does not create a genuine

issue of material fact when the witness has testified to a lack

of memory and no affirmative evidence has been introduced.  See,

e.g. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)

(holding that moving party may meet burden of establishing that

there is no genuine issue of material fact by pointing to the

absence of evidence to support the non-moving party's claim, and

finding "no express or implied requirement in Rule 56 that the

moving party support its motion with affidavits or other similar

materials negating the opponent's claim."); see also FDIC v.

National Union Fire Ins. Co, 205 F.3d 66, 75 (2d Cir. 2000)

(where party bears burden of proof at trial, "vague denials and

memory lapses . . .  do not create genuine issues of material

fact.").

Moreover, even accepting the "possibility" Mr. DeBiase's

testimony left open a "sinister motive" or "dishonest purpose,"

see Carroll v. Allstate Ins. Co., 262 Conn. 422, 445 (2003)

(finding that reference by defendant insurer's investigator to

plaintiff as "a black man and a 'son of a bitch'," "could have

led the jury to find that the plaintiff's race might have played

a role in the defendant's conclusion of arson"), such evidence is insufficient to establish a breach of the implied covenant of good faith and fair dealing where, as here, the insurer's claim determination is otherwise fully justified by the policy terms. See, e.g. Alexandru, 81 Conn. App. at 80-81. Evidence of a motive to act unreasonably is a necessary but not sufficient condition to proof of a bad faith claim. What plaintiffs have failed to produce on summary judgment is evidence that Colonial Penn in fact breached its duty to the insured by acting unreasonably or contrary to the policy provisions, or that plaintiffs could reasonably expect to receive approval of their claim.[5] Colonial Penn's finding that plaintiffs intentionally

---

[5]Plaintiffs' reliance on United Technologies Corp. v. American Home Assurance Co., 118 F. Supp. 2d 181 (D. Conn. 2000), in which this Court concluded that "procedural bad faith" claims were cognizable under Connecticut law, is inapposite, as plaintiffs here have not identified any facts supporting a conclusion of procedural bad faith. While plaintiffs argue that Colonial Penn's delay in deciding the claim was unreasonable, they have not specified why they claim this delay was unreasonable. In the absence of such facts, plaintiffs cannot prevail on their bad faith claim. See id. at 187 (citing McCauley Enterprises, Inc. v. New Hampshire Ins. Co., 716 F.Supp. 718 (D. Conn. 1989)). The record before this Court reveals that Colonial Penn's investigation began shortly after the claim was filed, and was comprehensive in that investigators interviewed plaintiffs and their neighbors informally and under oath, and experts, including a Certified Fire Marshall and a property adjuster, examined the property and the relevant records. The record reveals an investigation that was ongoing throughout the period from August 28, 2000 to May 9, 2001, when Colonial Penn formally denied plaintiffs' claim. See, e.g. Affidavit of Robert Nattrass, Jan. 20, 2004 [Doc. # 69, Ex. B] (stating examination of structure was performed on September 27, 2000); Affidavit of Marion Guzik, Jan. 23, 2004 [Doc. # 69, Ex C] (stating that

20

set the fire to the premises, which plaintiffs vigorously
dispute, was but one of ten separate grounds on which Colonial
Penn denied their claim.  As to two grounds on which Colonial
Penn relies at this summary judgment stage, this Court finds
there is no genuine dispute of material fact.

First, the Court concludes that there is no genuine dispute
that plaintiffs' homeowners insurance policy incepted on August
3, 2000.  It is undisputed that by its terms, the policy
inception date was August 3, 2000.  Plaintiffs' expert adjuster,
Wesley Robinson, testified at his deposition that he believed
plaintiffs were insured from the time of their closing on the
property (which here is claimed to be June 28, 2000)[6], because
"typically when you have a closing with attorneys representing
you, attorneys typically make sure that there is insurance on the
property especially if there's a mortgage instrument in place."
Deposition of Wesley Robinson, June 19, 2003 [Doc. # 79, Ex. V]
at 22.  This testimony does not create a material dispute as it
expresses no personal knowledge about what actually happened
here, where no mortgage is claimed to exist, and as plaintiffs

---

examination of premises occurred on September 28, 2000); Letter
of Joel J. Rottner to Earl Craig, October 4, 2000 [Doc. # 95, Ex.
A] (stating that Examination Under Oath was necessary before
Colonial Penn would consider claim further); Examination Under
Oath of Mary Gore ("Gore Examination"), Dec. 4, 2000 [Doc. # 79,
Ex. B]; Examination Under Oath of Earl Craig, Feb. 21, 2001 [Doc.
# 69, Ex. G].

[6]See Gore Examination, Dec. 2, 2000 [Doc. # 79, Ex. B] at 7.

have not claimed to have insurance at the time of closing.  See
Gore Examination [Doc. # 79, Ex. B] at 117 (testifying that she
first contacted Colonial Penn about obtaining insurance on July
17, 2000).  Further, Gore's testimony during her Examination
Under Oath that she spoke with a Colonial Penn agent who debited
Craig's checking account "way before" the first fire does not
create a dispute as to the policy inception date when Gore also
testified that she was told the policy had not begun at the time
of her phone call and that she did not know when the policy
incepted.  See id. at 118.

It is similarly undisputed that the fires on the premises
occurred on August 2 and August 4, 2000, and that plaintiffs
filed a claim on August 28, 2000 for only the August 4 fire.  See
Bridgeport Fire Department Incident Report, Aug. 2, 2000 [Doc. #
69, Ex. A]; Bridgeport Fire Department Incident Report, Aug. 4,
2000 [Doc. # 69, Ex. E]; White Aff. [Doc. # 69, Ex. I] at ¶ 6;
Colonial Penn Claim Inquiry General Information [Doc. # 69, Ex.
I] at 3.  Plaintiffs acknowledge that they were aware of the
August 2, 2000 fire at the time they filed their claim, as Gore
testified that she arrived at the house on the morning of August
2, 2000 to find that "a burnt home," and as the Fire Department
Incident Reports were provided to Earl Craig on August 7, 2000.
See id.  Plaintiffs do not dispute that they did not reside on

22